## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| Intellectual Ventures II LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Case No. 6:15-CV-59-JRG** |
| | § | **LEAD CASE** |
| Bitco General Insurance Corp., f/k/a, | § | |
| Bituminous Casualty Corp.; and | § | |
| Bitco National Insurance Co., f/k/a | § | |
| Bituminous Fire and Marine Insurance Co., | § | |
| | § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| Intellectual Ventures II LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Case No. 6:15-CV-60-JRG** |
| | § | |
| Great West Casualty Company, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF INTELLECTUAL VENTURES II, LLC'S
## OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND .............................................................................................. 1

III.  APPLICABLE LAW ....................................................................................... 2

IV.   DISPUTED TERMS IN THE '177 PATENT ................................................. 3

      A.    User Identifier (Claim 1) ..................................................................... 3

      B.    Distributed Information Access Point (Claims 11 and 16)................... 4

      C.    Centralized Access Point/Centralized Access Point of a User
            (Claims 11 and 16) .............................................................................. 6

      D.    Centralized Access Point of the Particular User (Claim 16) ................ 7

      E.    Terms the Defendants Wrongly Contend Are Means Plus Function
            Limitations ........................................................................................... 9

            1.    Selection Client/Retrieval Client (Claim 1) .............................. 10

            2.    Centralized Access Point of a User/At Least One Distributed
                  Information Access Point (Claim 11) ........................................ 13

            3.    Administrative Interface (Claim 11) .......................................... 16

            4.    Assembling Content Into One or More Distributed Information
                  Access Points (Claim 16) ........................................................... 18

            5.    Accessing the Centralized Access Point of the Particular
                  User (Claim 16) .......................................................................... 19

V.    DISPUTED TERMS IN THE '555 PATENT ................................................. 19

      A.    Device Key Seed [$S_d$] (Claims 1, 7, and 15) ................................... 19

      B.    Storage Device (Claims 1, 7, and 15)................................................. 21

      C.    Terms the Defendants Wrongly Contend Are Means Plus Function
            Limitations .......................................................................................... 22

1.      Storage Device (Claim 1)........................................................................22

2.      Encryption/Decryption Module (Claim 1)................................................23

3.      Wherein the Device Key Seed $S_d$ is Said Randomly Generated (Claims 7 and 15)...................................................................................26

4.      Wherein the Encryption/Decryption Module is Further Adapted to Randomly Generate the Device Key Seed (Claim 1) .................................28

V.      CONCLUSION ........................................................................................29

# TABLE OF AUTHORITIES

## Cases

*CBT Flint Partners, LLC v. Return Path, Inc.*,
   654 F.3d 1353 (Fed. Cir. 2011) ................................................................8

*Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*,
   467 F. Supp. 391 (S.D.N.Y. 1979) .......................................................27

*E2E Processing, Inc. v. Cabela's Inc.*,
   2015 U.S. Dist. LEXIS 86060 (E.D. Tex. July 2, 2015) ..................14

*Energizer Holdings, Inc. v. ITC*,
   435 F.3d 1366 (Fed. Cir. 2006) ................................................................8

*Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*,
   279 F.3d 1022 (Fed. Cir. 2002) ..............................................................27

*Genband USA LLC v. Metaswitch Networks Ltd.*,
   2015 U.S. Dist. LEXIS 103512 (E.D. Tex. Aug. 6, 2015) ..................*PASSIM*

*i4i LP v. Microsoft Corp.*,
   6:07-cv-113, No. 111 (E.D. Tex. Apr. 10, 2008) .............................22

*Kroy IP Holdings, L.L.C. v. AutoZone, Inc.*,
   2014 U.S. Dist. LEXIS 176442 (E.D. Tex. Dec. 23, 2014) ..............8

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ..............................................................20

*Linear Tech. Corp. v. Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004) ..............................................................12

*Net MoneyIN Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008) ..............................................................27

*Personalized Media Comm'ns, LLC v. ITC*,
   161 F.3d 696 (Fed. Cir. 1998) .........................................................9, 13

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .........................................................4, 5

*Polycom, Inc. v. Codian Ltd.*,
   2007 U.S. Dist. LEXIS 97892 (E.D. Tex. Oct. 19, 2007) ..............27

*Rodime PLC v. Seagate Tech., Inc.*,
  174 F.3d 1294 (Fed. Cir. 1999) ................................................................18, 19

*SimpleAir, Inc. v. Google, Inc.*,
  2015 U.S. Dist. LEXIS 54264 (E.D. Tex. Apr. 27, 2015)..............................2, 4

*SmartFlash LLC v. Apple Inc.*,
  2015 U.S. Dist. LEXIS 91669 (E.D. Tex. July 15, 2015) ........................*PASSIM*

*Source, Inc. v. Am. Express Co*,
  2007 U.S. Dist. LEXIS 68248 (E.D. Tex. Sept. 14, 2007)..............................20

*Spectrum Pharms., Inc. v. Sandoz Inc.*,
  2013 U.S. Dist. LEXIS 181673 (D. Nev. Dec. 31, 2013) ................................27

*Stragent LLC v. Intel Corp.*,
  2013 U.S. Dist. LEXIS 128979 (E.D. Tex. Aug. 13, 2013)..............................8

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
  31 F.3d 1336 (Fed. Cir. 2013) ..........................................................................9

*Thorner v. Sony Computer Entertainment Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ......................................................................21

*Watts v. XL Sys., Inc*,
  232 F.3d 877 (Fed. Cir. 2000) ..........................................................................9

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ......................................................................2, 9

*WMS Gaming, Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999) ......................................................................28

**Statutes and Rules**

35 U.S.C. § 112 ¶ 6...........................................................................................*PASSIM*

FED. R. CIV. P. 56(a) ...........................................................................................10

## I.      INTRODUCTION

The two patents at-issue in this case, though relating to complex technology, contain straightforward disputed claim language.  Intellectual Ventures' proposed constructions remain true to the intrinsic record and should be adopted.  The Defendants, in contrast, attempt to narrow the claims based on example embodiments in the specification, teachings that sit within a broader disclosure.  The Court should reject that noninfringement-driven approach.

The Court should also deny the Defendants' attempt to recast as means-plus-function limitations structural claim terms such as "client" and "interface."  Skilled artisans understand that those elements connote structure, and this Court has recently rejected the same kind of means-plus-function positions that the Defendants propose here.  It should do so again.

There are only a handful of terms that require a construction in order to be understandable to a jury.  For those terms, Intellectual Ventures respectfully requests that the Court adopt its proposed constructions.  For the remainder, Intellectual Ventures requests that the plain and ordinary meaning of the term apply.

## II.      BACKGROUND

The case involves two patents: U.S. Patent No. 7,516,177 ("the '177 Patent") and U.S. Patent No. 8,929,555 ("the '555 Patent).  The '177 Patent claims priority to an application filed in May, 2000 and is entitled "Apparatus for Distributing Content Objects to a Personalized Access Point of a User Over a Network-Based Environment and Method."  Generally, the Patent is directed at a client-server architecture that allows a user to access, through a personalized access point, content that has been added by or for the user.  The '177 Patent depicts the system through a series of web browser screens that display the functionality of the client-server architecture.  For instance, Figure 10 of the Patent shows a personalized access point (My

Knowledge and Tools) that contains a link to content (What is Wireless LAN?) that was added by or for a user (Suzi Henriot):



'177 Patent, Figure 10.

The '555 Patent relates to a different aspect of a computer system.  It is directed to computer security.  The '555 Patent is entitled "Data Encryption Systems and Methods" and claims priority to an application filed in September, 2004.  The Patent teaches a method for creating a secure "key seed" that is then used to encrypt computer data.  The key seed is generated by using the timing of operations on a computer storage device.  Intellectual Ventures alleges that the Defendants infringe various claims of the '177 and '555 Patents.

## III.     APPLICABLE LAW

This Court is familiar with claim construction and indefiniteness principles.  *E.g.*, *SimpleAir, Inc. v. Google, Inc.*, No. 2:14-CV-0011-JRG, 2015 U.S. Dist. LEXIS 54264, at *6–9 (E.D. Tex. Apr. 27, 2015).  This Court is also familiar with the framework to assess whether a claim term that does not employ the term "means" should still be construed as a means-plus-function limitation.  *E.g.*, *SmartFlash LLC v. Apple Inc.*, No. 6:13-CV-447-JRG-KNM, 2015 U.S. Dist. LEXIS 91669, at *7–11 (E.D. Tex. July 15, 2015) (discussing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 (Fed. Cir. 2015) (en banc)).  Intellectual Ventures will not

repeat those principles here, but will address the disputes between the parties.

**IV.      DISPUTED TERMS IN THE '177 PATENT**

**A.      User Identifier (Claim 1)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| "Information that identifies a user" | "user-assigned information that identifies a user" |

The parties present a narrow dispute over the "user identifier" term: whether it is limited to *user-assigned* information or can encompass a computer-generated value that identifies a user. Nothing in the plain claim language limits a "user identifier" to solely user-assigned values. The plain and ordinary meaning of a "user identifier" is information that identifies a user. The plain language does not limit the term to "user-assigned" information, and nothing in the claim language contains that requirement. The claims require the storage of and submission of user identifiers; they do not require the identifier to be user assigned. '177 Patent, claim 1.

Given the broad ordinary meaning and the term's usage in the claims, the specification must contain lexicography or clear disavowal to limit the "user identifier" term. *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1308–09 (Fed. Cir. 2014). The specification does not meet that exacting standard. *See id*. Thus, the plain meaning—which does not limit the identifier to a user-assigned value—governs.

Regardless, the specification contravenes the Defendants' construction and demonstrates that it is too narrow. The specification discloses that the user identifier can be user-assigned or computer-generated. The specification teaches that "*[a]ccording to one implementation*," the user identifier "comprises a ***user-assigned*** alpha-numeric identification . . . ." '177 Patent, col. 16 ll. 11–16 (emphases added). According to another implementation, the user can "register and

*receive* a user identification" (a type of user identifier) from the computer system.  *Id.*, fig. 25, col. 11 ll. 54–58, col. 34 ll. 31–37 (emphasis added).  The specification teaches that the system can use a computer-generated identifier to access content for a user by appending the identifier to an Internet address (*e.g.*, http:URLaddress.com?userid=1).  *Id.*, col. 48 ll. 34–44.  There is no reason to exclude the latter embodiment from the scope of the claims.  *SimpleAir*, 2015 U.S. Dist. LEXIS 54264, at *111 ("A construction that excludes disclosed embodiment is rarely correct.") (internal quotation marks omitted).

### B.        Distributed Information Access Point (Claims 11 and 16)

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction is necessary.  Plain and ordinary meaning.<br><br>Alternatively, "a network resource that enables a user to interact with a centralized access point" | "a resource on a network, such as a web page, that is separate from the centralized access point of a user, and can be accessed by and includes information visually perceptible to multiple users" |

For this term, the Defendants attempt to load into the claim language additional requirements that the claims do not require.  A distributed information access point is a network resource, such as a server or client computer executing software, that enables a user to interact with a centralized access point.

The claims detail these aspects of the term and "provide substantial guidance as to the meaning" of the term.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  In claim 11, the "distributed information access point" is "accessible via a communications link and operative to implement one or more of: a) list one or more content objects, b) allow a user to choose content for addition to their centralized access point, and c) provide the user with logon access to their centralized access point."  '177 Patent, claim 11.  Claim 16 provides more detail about the "distributed information access point."   In that claim, content is assembled into a

distributed information access point, the access point is presented to "one or more potential users," content from the distributed information access point is added to a centralized access point of a particular user, and the centralized access point is accessed from the distributed information access point to then access the content.  *Id.* at claim 16.  The claim language does not contain the limitations the Defendants attempt to inject into term.

Nor does the remainder of the Patent.  Dependent claim 12, for instance, recites that the distributed information access point may be "one or more of: a) a web page; b) a plurality of web pages; c) a portion of a web page; d) an email message; and e) a portion of an email message." '177 Patent, claim 12.  That limitation is absent from claims 11 and 16.  Thus, the Defendants' attempt to limit the claims to a "resource, such as a webpage" fails in light of claim 12.  *Phillips*, 415 F.3d at 1314–15 ("Differences among the claims can be a useful guide in understanding the meaning of particular claim terms.").

Likewise, the Defendants' requirement that the distributed information access point "be accessed by and includes information visually perceptible to multiple users" is incorrect.  The specification explains that making information "visually perceptible" to users is but "[o]ne technique" of distributing information using a distributed information access point.  '177 Patent, col. 6 ll. 60–64.  Claim 16, in addition, recites that the "distributed information access point" is presented to "***one or more*** potential users"—not multiple users—and claim 16 already includes "visually perceptible" claim language.  Claim 11 does not address how many users must be able to access the "distributed information access point" and lacks "visually perceptible" limitation. The Defendants' proposed construction conflicts with these teachings.

Lastly, nothing in the Patent requires the "distributed information access point" to be "separate" from the "centralized access point of a user."  At no point does the specification

describe the two access points as "separate" resources.  Indeed, the specification indicates the opposite.  It displays within the same webpage information relating to the distributed information access point as well as information relating to the centralized access point of a user.  *See, e.g.*, '177 Patent, fig. 13 (depicting in a browser the "My Know-How" information connected to the centralized access point as well as the "BROWSE" link, which displays a list of links from which content can be added to the centralized access point for Suzi Henriot).

Indeed, the Defendants recognize that the "distributed information access point" does not contain the "separate" limitation.  In their petitions to institute review before the Patent Trial & Appeal Board ("PTAB"), the Defendants proposed a construction of "distributed information access point" that lacks the "separate" requirement.  The Defendants proposed that the term means "an access point that makes information visually perceptible to multiple users, such as a web page or login page."  Declaration of Christian Hurt ("Hurt Decl."), Ex. A, at 10.  They did not include the "separate" requirement that they propose here.

> C.   **Centralized Access Point / Centralized Access Point of a User (Claim 11 and 16)**

| **Plaintiff's Construction** | **Defendants' Construction** |
|---|---|
| No construction is necessary.  Plain and ordinary meaning.<br><br>Alternatively, "a network resource accessible to one or more users and that can be used to access content" | "a resource on a network, such as a web page, that is assigned to a user and can be accessed by that user" |

The Defendants' attempts to limit the "centralized access point" terms likewise fail.  Like the "distributed information access point," the claims provide substantial guidance on the "centralized access point" terms—and they do not contain the Defendants' additional limitations. Claim 11 provides that a "centralized access point" provides "the user with access to content

chosen by or for the user" and recites that "a user is enabled with the capability to log on to their centralized access point from one or more distributed information access point(s) and access content chosen from one or more distributed information access point(s)." '177 Patent, claim 11. Claim 16 similarly recites "accessing the centralized access point of the particular user from one or more distributed information access points to gain access to the selected content." *Id.*, claim 16. The claims thus explain that the "centralized access point" is used to access content, either "content chosen by or for the user" (claim 11) or the "selected content" (claim 16).

The Defendants' limitations of "a resource on a network, such as a webpage" and that the "centralized access point" is "assigned to a user and can be accessed by that user" lack a hook in the intrinsic record. Again, the claims do not require the "centralized access point" to be a webpage-type resource. They do not require the "centralized access point" to be "assigned." Nor does the specification contain those requirements.

Like the "distributed information access point" term, the Defendants' positions in their petitions to the PTAB are at odds with the construction of "centralized access point" that they propose here. In their PTAB petitions, the Defendants proposed that the "centralized access point" is "an access point that aggregates content objects, or links to content objects, that are selected by or for the user." Hurt Decl., Ex. A, at 9. They did not propose the "assigned" limitation that they propose here. Nor did they propose that the "centralized access point" is "separate" from the "distributed information access point."

**D.      Centralized Access Point of the Particular User (Claim 16)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Same as "centralized access point of a user" | This term lacks antecedent basis and is therefore indefinite.<br><br>Alternatively, same as "centralized access |

| | point of a user" |
|---|---|

The parties' dispute over this term is very narrow: whether the claim is invalid because it recites "a centralized access point of *the* particular user" instead of "a centralized access point of *a* particular user."  The Defendants' hyper-technical antecedent-basis position lacks merit and should be rejected accordingly.

Claim 16 does not suffer from an antecedent-basis problem.  It is undisputed that the limitation recites the element "*a* centralized access point of the particular user" in the first instance and then "*the* centralized access point of the particular user" in the second instance. Thus, the centralized access point has an explicit antecedent basis and is not indefinite.

The Defendants instead focus on the language "*the* particular user" to allege a lack of antecedent basis that renders the claim indefinite.  That argument falls flat, particularly in light of the exacting standard to prove indefiniteness.  *Kroy IP Holdings, L.L.C. v. AutoZone, Inc.*, No. 2:13-CV-888-WCB, 2014 U.S. Dist. LEXIS 176442, at *54 (E.D. Tex. Dec. 23, 2014).  Indeed, Courts have rejected the Defendants' type of quibbles of form over substance.  *See Stragent LLC v. Intel Corp.*, No. 6:11-CV-421-LED-JDL, 2013 U.S. Dist. LEXIS 128979, at *9–13 (E.D. Tex. Aug. 13, 2013) (construing "the crossbar switch" as "a crossbar switch" to rectify an antecedent basis issue and concluding the claims were not indefinite); *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1359 (Fed. Cir. 2011) (correcting an obvious error in the phrase "detect analyze" to recite "detect <u>and</u> analyze" and rejecting indefiniteness defense).

It is also well settled that the lack of *explicit* antecedent basis does not render a claim indefinite when the claim *implies* that antecedent basis.  *Energizer Holdings Inc. v. ITC*, 435 F.3d 1366, 1371 (Fed. Cir. 2006); *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1376 (Fed. Cir. 2008).  Here, the claim recites that a distributed information

access point is presented to "one or more potential users," that content is selected from a distributed information access point for addition to the centralized access point "of the particular user," and that the centralized access point "of the particular user" is accessed in order to access to the selected content.   '177 Patent, claim 16.   Thus, the claims provide with reasonable certainty that the "particular user" is the user from the "one or more potential users" for which content has been selected and accessed.   There is no antecedent basis issue.

> **E.   Terms the Defendants Wrongly Contend Are Means-Plus-Function Limitations**

The Defendants contend that a number of terms—none of which include the term "means"—are constructively means-plus-function limitations governed by 35 U.S.C. § 112, sixth paragraph.   A claim term that lacks the term "means" is presumptively not a means-plus-function limitation.   *Williamson*, 792 F.3d at 1348 (citing *Personalized Media Comm'ns, LLC v. ITC*, 161 F.3d 696, 703–04 (Fed. Cir. 1998)).   A challenger may only rebut this presumption if "the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting structure for performing that function.'"   *Id.* at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880).   The inquiry focuses on "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."   *Id.*

The challenger faces a heighted burden when alleging that a claim term lacks corresponding structure.   Because a claim is invalid if it lacks corresponding structure, the challenger must "make that showing by clear and convincing evidence."   *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1349 (Fed. Cir. 2013).   Stacked on that burden is the summary judgment burden under Rule 56 to demonstrate no genuine issue of material fact.

The Defendants have failed to make these required showings.   Each of the terms at issue

is sufficiently structural to avoid the application of § 112, sixth paragraph.  In addition, the Defendants have failed to meet their summary judgment burden to show by clear and convincing evidence that the "administrative interface" term is indefinite for lack of corresponding structure. Intellectual Ventures will address each term below.

### 1.    Selection Client / Retrieval Client (Claim 1)

| **Plaintiff's Constructions** | **Defendants' Constructions** |
|---|---|
| **Selection Client** | **Selection Client** |
| The term is not a means-plus-function limitation. | The term is a means-plus-function limitation subject to § 112 ¶ 6. |
| No construction is necessary.  Plain and ordinary meaning. | <u>Claimed Functions</u><br>(1) "communicating with the server via a communication link"<br>(2) "configured to allow a user to select content objects to add to a personalized access point by submitting an indicia and a user identifier to the server" |
| Alternatively, should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the following corresponding structure: | |
| 2:45-61; 10:4-61; Figs. 6A, 6B, 7, 9, 11, 12, 16, and 17; and sections of Figs. 8, 13, 14, and 15; and equivalents thereof. | <u>Corresponding Structure</u><br>2:45–56; FIG. 1; 10:4–18; 10:41–61; 11:10–38; 11:45–13:40; FIG. 4; 15:51–16:38; FIG. 38; 44:19–45:42; FIG. 39; 45:43–59. |
| **Retrieval Client** | **Retrieval Client** |
| The term is not a means-plus-function limitation. | The term is a means-plus-function limitation subject to § 112 ¶ 6. |
| No construction is necessary.  Plain and ordinary meaning. | <u>Claimed Functions</u><br>(1) "communicating with the server via a communication link"<br>(2) "allowing a user to retrieve information from a personalized access point" |
| Alternatively, should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the following corresponding structure: | |
| 2:45-61; 10:4-61; Figs. 8, 10, 13, 14, and 15; and equivalents thereof. | <u>Corresponding Structure</u><br>2:45–49; 2:56–57; FIG. 1; 10:4–18; 10:41–61; 11:10–38; 11:45–13:40; FIG. 8; 22:20–23:10; FIG. 10; 24:5–34; FIG. 13; 25:60–26:6; FIG. 14; 26:8–27:8. |

The terms "selection client" and "retrieval client" are not means-plus-function limitations.  As an initial matter, a "client" is understood by those of skill in the art as a type of structure: "a station or program requesting a service."  Hurt Decl., Ex. B, at 162 (The IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed. 1996)); *see also* Hurt Decl., Ex. C (Microsoft Press Computer Dictionary (3d ed. 1997)), at 92 (defining "client" as including a computer program that "requests a service provided by another program" as well as "a computer that access shared network resources" provided by a server).

The '177 Patent is consistent with that understanding.  It describes a "client" as structure within a client-server network architecture.  '177 Patent, fig. 1 (depicting a client computer and client wireless system within a client-server network architecture); col. 9 l. 54–col. 17:47 (describing a "Client/Server Exemplary Architecture").   The Patent specifically describes a "client" as computer or software structure that resides within that architecture:

> For purposes of this disclosure, the term "client" is understood to include a workstation or a computer, such as a personal computer, a hand-held computer, or a portable electronic device such as a wireless web appliance having computing capabilities, and provided within a client/server environment.  A "client" is also intended to include a device present in a network, such as the Internet, that includes a software program for enabling a user to interact with the network and send and receive files, electronic mail, and/or data.   Even furthermore, "client" is intended to include, in a network environment, a computer or workstation connected to the network and the server and including web-enabled appliances, or any other device having processing capabilities. It is further understood that a "client" can include a software component such as a web browser.

*Id.* at col. 10 l. 4–18.  The Defendants likewise understand that a "client" connotes structure.  In their petitions before the PTAB, the Defendants proposed that the broadest reasonable construction of "client" included the structures recited in the specification.  Hurt Decl., Ex. A, at 11–12.  They did not contend, as they do here, that the term "client" is so broad to be purely

functional and invoke § 112, sixth paragraph. *See id.*

The selection and retrieval clients in the claims relate to a narrower class of clients that operate in a specific manner. A "selection client" is a client that communicates with a server and is configured to allow a user to select content objects to add to a personalized access point by submitting an indicia and a user identifier to the server. '177 Patent, claim 1. A "retrieval client" is also a specific type of client—one that communicates with a server and allows a user to retrieve information from a personalized access point. *Id.* That additional language describes the operation of each type of client and its interaction with the server, and it further counsels against finding that the client terms are means-plus-function limitations. *See SmartFlash LLC v. Apple Inc.*, 2015 U.S. Dist. LEXIS 91669, at *7–16 (concluding that the term "processor" was not a means-plus-function limitation).

Moreover, the claimed selection and retrieval clients operate as a type of circuit to perform specific operations, which further weighs against the Defendants' construction. The Federal Circuit has repeatedly concluded that a "circuit" that performs operations falls outside the ambit of § 112, sixth paragraph. *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("[W]hen the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply").

The terms here relate to computer circuits—a client computer or a processor executing client software—and technical dictionaries define a "client" as circuit-based structure. As recited above, each type of claimed client performs specific operations, namely communicating with a server and, depending on the type of client, allowing a user to select content objects to add to a personalized access point or retrieving information from a personalized access point. '177

Patent, claim 1.  Under Federal Circuit precedent, the circuit-based nature of these terms further counsels against rewriting them as means-plus-function limitations.

Indeed, the Defendants recognize that these terms are structural.  In their petitions before the PTAB, the Defendants proposed structure-based constructions of the "selection client" and "retrieval client" terms.  Hurt Decl., Ex. A, at 12–13.  They did not, as they do here, contend that that "selection client" and "retrieval client" are means-plus-function limitations.  *See id.*  And, as recited above, the record demonstrates that the terms are not means-plus-function limitations.  Should the Court conclude, however, that the "retrieval client" and "selection client" terms are means-plus-function limitations, Intellectual Ventures proposes the corresponding structure recited above.

> **2.      Centralized Access Point of a User / At Least One Distributed Information Access Point (Claim 11)**

| **Plaintiff's Construction** | **Defendants' Construction** |
|---|---|
| **Centralized Accessed Access Point** | **Centralized Accessed Access Point** |
| The term is not a means-plus-function limitation. | The term is a means-plus-function limitation subject to § 112 ¶ 6. |
| No construction is necessary.  Plain and ordinary meaning. | Claimed Functions<br>(1) "accessible via a communications link"<br>(2)"operative to provide the user with access to content chosen by or for the user" |
| Alternatively, should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the following corresponding structure: | Corresponding Structure<br>The "'personal HowZone', or personal web page, 198," FIG. 8; 22:20–23:10; the personal web page, FIG. 10; 24:5–34; the personal web page, FIG. 13; 25:60–26:6; the personal web page, FIG. 14; 26:8–27:8. |
| Figs. 8, 10, 13, 14, and 15; and equivalents thereof. | |
| **Distributed Information Access Point** | **Distributed Information Access Point** |
| The term is not a means-plus-function limitation. | The term is a means-plus-function limitation subject to § 112 ¶ 6. |
| No construction is necessary.  Plain and | Claimed Functions |

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| ordinary meaning.<br><br>Alternatively, should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the following corresponding structure:<br><br>Figs. 6A, 6B, 7, 9, 11, 12, 16, and 17; and sections of Figs. 8, 13, 14, and 15; and equivalents thereof. | (1) accessible via a communications link (2) operative to implement one or more of: a) list one or more content objects, b) allow a user to choose content for addition to their centralized access point, and c) provide the user with logon access to their centralized access point"<br><br>Corresponding Structure<br>The HowZone.com banner 238, FIG 11; 24:35–25:2; the banner 238, FIG. 37; 42:28–44:18; the content distribution token 461; FIG. 38; 44:19–45:42 |

The terms "centralized access point of a user" and "distributed information access point" are not means-plus-function limitations.  In the context of the '177 Patent, an "access point" is a specific software structure that provides access to information.  *See Genband USA LLC v. Metaswitch Networks Ltd.*, No. 2:14-CV-33-JRG-RSP, 2015 U.S. Dist. LEXIS 103512, *53–59 (E.D. Tex. Aug. 6, 2015) (concluding that a number of "agent" terms were not a means-plus-function limitation because those of skill in the art would understand that an "agent" was "particular software structure"); *SmartFlash*, 2015 U.S. Dist. LEXIS 91669, at *7–16 (concluding that the terms "code" and "processor" were sufficient structures to avoid § 112, sixth paragraph); *E2E Processing, Inc. v. Cabela's Inc.*, No. 2:14-CV-36-JRG-RSP, 2015 U.S. Dist. LEXIS 86060, at *13–24 (E.D. Tex. July 2, 2015) (concluding the terms "selector component," "adapter component," and "integration component" were particular software structures and not subject to avoid § 112, sixth paragraph).

The Defendants, in their PTAB petitions, recognized that an "access point" connotes specific software structure.  They proposed that the broadest reasonable construction of "access point" was "a resource on a network, such as a web page, that allows a user to access links and

content objects."  Hurt Decl., Ex. A, at 8.  They did not propose that an "access point" in general—or the "distributed information access point" and "centralized access point" terms in particular—was so devoid of structure to invoke § 112, sixth paragraph.  *See id.* at 8–10.

The claims provide further context on the operations of the claimed "access points" and how they interact with other components.  That context weighs against concluding that the terms are means-plus-function limitations.  The claims delineate that a distributed information access point is "accessible via a communications link and operative to implement one or more of: a) list one or more content objects, b) allow a user to choose content for addition to their centralized access point, and c) provide the user with logon access to their centralized access point."  '177 Patent, claim 11.  The claims likewise recite that content is assembled into a distributed information access point, the access point is presented to one or more potential users, content from the distributed information access point is added to a centralized access point of a particular user, and the centralized access point is accessed from the distributed information access point to then access the content.  *Id.*, claim 16.  Indeed, in claim 12, the "distributed information access point" is embodied in an explicit and specific software structure: "a) a web page; b) a plurality of web pages; c) a portion of a web page; d) an email message; and e) a portion of an email message."  *Id.*, claim 12.

The claims provide a similar level of detail for the "centralized access point."  That term provides "the user with access to content chosen by or for the user," and "a user is enabled with the capability to log on to their centralized access point from one or more distributed information access point(s) and access content chosen from one or more distributed information access point(s)."  '177 Patent, claim 11; *see also id.*, claim 16 (reciting "accessing the centralized access point of the particular user . . . to gain access to the selected content").

These recitations of the inputs, outputs, and operations of the access point terms weigh towards concluding that those terms connote sufficient definite structure.  *E.g.*, *SmartFlash*, 2015 U.S. Dist. LEXIS 91669, at *9–11 (holding that "code responsive to" and "code to evaluate" terms connoted sufficient structure because, among other reasons, the claims "include[d] substantial additional language describing the operation of the components at issue and their interaction with other components").  But the specification also contains additional structural evidence.  In particular, the specification teaches the specifics of the access point software by displaying webpages in web browsers that perform the claimed operations.  *See, e.g.*, '177 Patent fig. 7 (depicting software that displays links to DAY TRADING and CREATING A PDF FILE FROM QUARK XPRESS content objects and provides a LOGON link that allows a user to logon to the user's personalized access point), fig. 9 (depicting software that allows a user to add content relating to "WHAT IS A WIRELESS LAN?" by clicking on the "ADD TO YOUR PERSONAL HowZone" button), fig. 10 (depicting "MY KNOWLEDGE AND TOOLS" for a logged in user that provides access to the "WHAT IS A WIRELESS LAN?" content).  In total, the intrinsic record demonstrates that these terms are not means-plus-function limitations.  Should the Court conclude otherwise, however, Intellectual Ventures proposes the corresponding structure recited above.

### 3.    Administrative Interface (Claim 11)

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| The term is not a means-plus-function limitation. | The term is a means-plus-function limitation subject to § 112 ¶ 6. |
| No construction is necessary.  Plain and ordinary meaning. | Claimed Functions<br>(1) in communication with the server<br>(2) operative to create groupings of content into one or more distributed information access points" |
| Alternatively, should the Court conclude that this term is a means-plus-function limitation, | |

| Intellectual Ventures proposes the following corresponding structure:<br><br>Figs. 18, 26, 34A, 34B, and 52; and equivalents thereof. | Corresponding Structure<br>This term is indefinite for failure to disclose adequate structure, including at least failure to disclose an algorithm corresponding to a function performed by computer software.<br><br>Alternatively, the "add new category screen display," FIG. 18; 4:30–33; 21:1–15; 28:17–30:6. |

The term "administrative interface" is not a means-plus-function limitation.  This Court has already held that "the word 'interface' connotes structure."  *Genband*, 2015 U.S. Dist. LEXIS 103512, at *41 (concluding that the term "telecommunications interface module" was not a means-plus-function limitation).  That holding is consistent with how skilled artisans would understand the term.  The Microsoft Computer Dictionary, for example, defines an "interface" in the context of the claims as "[s]oftware that enables a program to work with the user . . ., with another program . . ., or with the computer's hardware."  Hurt Decl., Ex. C, at 257.  Moreover, the '177 Patent describes an "interface" as an identifiable structure.  *E.g.*, '177 Patent, col. 16 ll. 39–58 (describing "graphical user interface features").

An "administrative interface" is one type of interface, and the claims further detail the operations of the "administrative interface"—it is in communication with the server and it operates to create groupings of content into one or more distributed information access points.  '177 Patent, claim 11.  That language weighs against finding that the "administrative interface" is a means-plus-function limitation.  Indeed, the Defendants did not allege in their PTAB petitions that the term was a means-plus-function limitation.  *See* Hurt Decl., Ex. A, at 7–13.

Should the Court conclude that the term is a means-plus-function limitation, the "administrative interface" term is not indefinite.  As the Defendants recognize, the '177 Patent discloses a number of exemplary administrative interfaces.  *E.g.*, '177 Patent, figs. 18, 24–26.

Intellectual Ventures disagrees, however, with the Defendants' limited corresponding structure and proposes the corresponding structure recited above should the Court conclude that the "administrative interface" is a means-plus-function limitation.

> **4.    Assembling Content Into One or More Distributed Information Access Points (Claim 16)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| The term is not a means-plus-function limitation.<br><br>No construction is necessary.  Plain and ordinary meaning.<br><br>Alternatively, should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the following corresponding structure:<br><br>Figs. 6A, 6B, 7, 9, 11, 12, 16, and 17; and sections of Figs. 8, 13, 14, and 15; and equivalents thereof. | The term is a means-plus-function limitation.<br><br>Claimed Functions<br>one or more distributed information access points<br>(1) "in communication with the database over the communication link"<br><br>Corresponding Structure<br>The HowZone.com banner 238, FIG 11; 24:35–25:2; the banner 238, FIG. 37. 42:28–44:18; the content distribution token 461, FIG. 38; 44:19–45:42. |

For the same reasons the term "at least one distributed information access point" in claim 11 is not a means-plus-function limitation, this claim term likewise does not implicate § 112, sixth paragraph.  Moreover, the "distributed information access point" limitations in claim 16 do not invoke § 112, sixth paragraph because they do not recite a function that corresponds to the alleged "means."  *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999) ("[A] claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6.").  Should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the corresponding structure recited above.

> **5.    Accessing the Centralized Access Point of the Particular User (Claim 16)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|

| | |
|---|---|
| The term is not a means-plus-function limitation. | The term is a means-plus-function limitation. |
| No construction is necessary.  Plain and ordinary meaning. | Claimed Functions<br>one or more distributed information access points<br>(1) allowing "access to the selected content" |
| Alternatively, should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the following corresponding structure: | Corresponding Structure<br>The HowZone.com banner 238, FIG 11; 24:35–25:2; the banner 238, FIG. 37. 42:28–44:18; the content distribution token 461, FIG. 38; 44:19–45:42. |
| Figs. 8, 10, 13, 14, and 15; and equivalents thereof. | |

For the same reasons the term "centralized access point of a user" is not a means-plus-function limitation in claim 11, this claim term likewise does not implicate § 112, sixth paragraph.  Moreover, the "centralized access point" limitations in claim 16 do not invoke § 112, sixth paragraph because they do not recite a function that corresponds to the alleged "means." *See Rodime*, 174 F.3d at 1302.   Should the Court conclude that this term is a means-plus-function limitation, Intellectual Ventures proposes the corresponding structure recited above.

## V.      DISPUTED TERMS IN THE '555 PATENT

### A.      Device Key Seed [$S_d$] (Claims 1, 7, and 15)

| **Plaintiff's Construction** | **Defendants' Construction** |
|---|---|
| "a digital value used to generate cryptographic keys [referred to as $S_d$]" | "a digital value [referred to as $S_d$], generated by the storage device, used to generate cryptographic keys" |

The parties dispute whether these terms should include the phrase "generated by the storage device."   The plain claim language resolves this dispute.   Some claims require the "storage device" to generate the device key seed, others do not.   Claim 1, for example, recites that the "storage device is adapted to randomly generate the device key seed $S_d$."  '555 Patent, claim 1.  Claim 7, in contrast, does not require the storage device to generate the key seed.   It

simply recites "randomly generating a device key seed $S_d$ according [to] a time interval between two specific operations on a storage device." *Id.*, claim 7.   That difference should end the inquiry.  *Source, Inc. v. Am. Express Co.*, No. 2-05-cv-364, 2007 U.S. Dist. LEXIS 68248, *19 (E.D. Tex. Sept. 14, 2007) (holding that where some claims had a "location" requirement and others did not, it was improper to import that "location" limitation absent a clear disclaimer).

Moreover, the specification does not require the "storage device" to generate the device key seed.  Some embodiments teach that the encryption/decryption module generates the device key seed, and that module may or may not reside in the storage device.  *See e.g.*, '555 Patent, Abstract ("The encryption/decryption module randomly generates a device key seed according to the occurrence time of a specific operation . . . ."); *id.*, col. 3 ll. 16–20 ("The encryption/decryption module 121 generates device key seeds and keys . . . .").   Other embodiments are agnostic on the origination of the key seed.  *E.g.*, *id.*, col. 2 ll. 9–13 ("In an exemplary embodiment of a data encryption method, a device key seed $S_d$ is randomly generated according to the time of a specific operation or the interval between two specific operations on the storage device.").   Thus, the specification is broader than the Defendants' proposed construction, which they appear to recognize.  *See* Hurt Decl., Ex. D, at 10 (Defendants' PTAB stating that the Defendants proposed in this litigation that "device key seed $S_d$" meant "[a] digital value used to generate cryptographic keys, referred to as $S_d$").   But even if it were not, the Defendants' proposed construction would still fail—nothing in the specification clearly limits the "device key seed" as always generated by the storage device.  *Source*, 2007 U.S. Dist. LEXIS 68248, *19; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

**B.      Storage Device (Claims 1, 7, and 15)**

| **Plaintiff's Construction** | **Defendants' Construction** |
| --- | --- |

| No construction is necessary.  Plain and ordinary meaning.  Alternatively, "volatile or non-volatile memory for storing data" | "a device that has non-volatile memory for the non-transitory storage of data to be encrypted" |
|---|---|

The dispute on this term is straightforward: is the term limited "non-volatile memory" that serves only one purpose—"the non-transitory storage of data to be encrypted"—or should the term "storage device" broadly include memory?  Nothing in the claims or the specification mandates the Defendants' narrow construction.  The '555 Patent does not provide any special meaning to the term "storage device."  *See*, *e.g.*, '555 Patent, Abstract ("The system includes a storage device storing data . . . ."); *id.*, col. 1 ll. 24–26 ("[T]he storage device storing the authentication data can be easily imitated by a simulator . . . ."); *id.*, col. 3 ll. 2–4 ("The storage device 120 connects to the host 110 via channel 130, such as a [USB] transmission channel."). Unless the intrinsic record contains lexicography, disavowal, or disclaimer that justifies departing from the plain meaning as understood by skilled artisans, the plain meaning of "storage device" should control.  *Thorner v. Sony Computer Entertainment Am. LLC*, 669 F.3d 1362, 1365–66 (Fed. Cir. 2012).  Consequently, the Court should not construe the term.

However, should the Court construe the term, Intellectual Ventures' proposal is consistent with the intrinsic and extrinsic record.  The intrinsic record does not differentiate between volatile and non-volatile storage or require the storage device to provide for the non-transitory storage of data to be encrypted.  The word "volatile" never appears in the Patent. Indeed, the Defendants declined to include in their PTAB petition the volatile-memory-based limitation that they raise in this litigation.  Hurt Decl., Ex. D, at 13–15.

Further, the extrinsic evidence—including the Defendants' submitted evidence—supports Intellectual Ventures' position.  The Microsoft Computer Dictionary defines a "storage device" as encompassing volatile memory such as RAM:

> An apparatus for recording computer data in permanent or semi-permanent form. When a distinction is made between primary (main) storage devices and secondary (auxiliary) storage devices the former refers to random access memory (RAM) and the latter refers to disk drives and other external devices.

Hurt Decl., Ex. E, at 424.  That definition is consistent with Intellectual Ventures' proposal.

> ### C.    Terms the Defendants Wrongly Contend Are Means-Plus-Function Limitations
>
> ### 1.    Storage Device (Claim 1)

| Claim Limitation |
|---|
| "a storage device adapted to store data D, . . . wherein the storage device is adapted to randomly generate the device key seed $S_d$ in response to interrupts that notify the storage device of occurrence of the two specific operations" |

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| No construction is necessary.  Plain and ordinary meaning. | Claimed Functions<br>(1) "storing data D"<br>(2) randomly generating the device key seed $S_d$ in response to interrupts that notify the storage device of occurrence of the two specific operations<br><br>Corresponding Structure<br>(1) a mobile device, such as a mobile phone, USB handy disk, or a language learning machine<br>(2) Indefinite |

The term "storage device" is not a means-plus-function limitation.  A "storage device" is a structural element.  Indeed, this Court has concluded that the term "storage" connotes structure such that a series of "storage means" terms—despite employing the term "means"—were not means-plus-function limitations.  *i4i LP v. Microsoft Corp.*, Memorandum Opinion and Order

(Dkt. No. 111) at 11–12, No. 6:07-cv-113 (E.D. Tex. Apr. 10, 2008) ("The disputed claim limitations contain the term 'storage,' which one of ordinary skill in the art would identify as a structural term.") (collecting cases).  The Court also concluded that a "storage means" was not limited to a hard drive and could encompass RAM (a volatile memory).  *Id.* at 12–13.  Under that authority, the Defendants' overly-narrow construction of "storage device" and their means-plus-function position fails.

Federal Circuit authority regarding circuit-based claim limitations also demonstrates that a "storage device" is structural.  The "storage device" term here relates to computer components, and technical dictionaries define a "storage device" in structural terms.  *See, e.g.*, Hurt Decl., Ex. E, at 424.  The '555 Patent describes the operation of the storage device, namely that it holds data.  *See, e.g.*, '555 Patent, claim 1 ("a storage device adapted to store Data D"), col. 3 ll. 9–11 ("The storage device 120 may be a mobile device, such as a mobile phone, USB handy disk, or a language learning machine."), col. 3 ll. 26–30 ("When the storage device 120 receives the request, in step S202, a device key seed $S_d$ is randomly generated according to the time of a specific operation or the interval between two specific operations on the storage device 120.").  Because a "storage device" connotes structure, it is not a means-plus-function limitation.

### 2.      Encryption/Decryption Module (Claim 1)

| Claim Limitation |
| --- |
| "an encryption/decryption module adapted to randomly generate a device key seed $S_d$ according to a time interval between two specific operations on the storage device, and adapted to apply the generated device key seed $S_d$ to data encryption of the data D" |

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| No construction is necessary.  Plain and ordinary meaning. | Claimed Function<br>(1) randomly generating a device key seed $S_d$ according to a time interval between two specific operations on the storage device<br>(2) applying the generated device key seed |

| | $S_d$ to data encryption of the data D |
|---|---|
| | Corresponding Structure<br>(1) Indefinite<br>(2) Key generation algorithm described at 4:12-14, and equivalents thereto; and the encryption mechanisms described at 4:24-30, including "left rotating r bits of authentication data" and TEA (Tiny Encryption Algorithm) |

The "encryption/decryption module" term is not a means-plus-function limitation.  While the term "module" by itself may not be sufficient definite structure in certain contexts, the term "encryption/decryption module" in the '555 Patent connotes structure.  *Genband*, 2015 U.S. Dist. LEXIS 103512, *40 (construing "telecommunications interface module" as not falling under § 112, sixth paragraph).

A person of ordinary skill in the art would understand an "encryption/decryption module" as structure. The '555 Patent contemplates the "encryption/decryption module" can be implemented in either hardware or software, including a particular software structure.  '555 Patent, col. 3 ll. 15–16 ("To reduce cost, a software implementation may be the best choice"). The specification provides context as to the inputs and outputs of the encryption/decryption module and how it interacts with other components.  For example, the specification provides an exemplar algorithm for generating an encryption key based on seeds.  *Id.*, col. 4 ll. 4–19 (showing formula and inputs).  Further, the '555 Patent provides that an encryption mechanism can be "any symmetric encryption, and the complexity and security level of [the] software encryption method can be selected according to hardware and security requirements."  *Id.*, col. 4 ll. 21–24.  Indeed, the patentee expected that certain off-the-shelf components could embody the "encryption/decryption module" recited in the claims.  *Id.*, col. 4 ll. 48–52 ("Data encryption methods, or certain aspects or portions thereof, may take the form of program code . . . embodied

in tangible media, such as products, floppy diskettes, CD-ROMS, hard drives, or any other machine-readable storage medium . . . .").

The patentee's statements during prosecution of the '555 Patent further show that an "encryption/decryption module" connotes structure.  During prosecution, the patentee appealed the examiner's rejections to the PTAB.  In its appeal decision, the PTAB issued a new ground of rejection on the basis that the limitation "randomly generate a device key seed $S_d$ according to a time interval between two specific operations" lacked written description.  Hurt Decl., Ex. F, at IV-INSEDTX-00000078–86.   In response, the patentee emphasized that the limitation was adequately described because pseudo-random number generators were known in the art.  *Id.* at IV-INSEDTX-00000024–25.  Specifically, the patentee emphasized U.S. Patent No. 5,732,138, which teaches a "pseudo-random number generator" that "deterministically generates a sequence of numbers by computational process from an initial number, called a seed."  *Id* at 25.  Thus, a person of ordinary skill in the art "could use the seed technique described in the '138 Patent to generate the 'device key seed' from a time interval value."  *Id*.   Hence, a random number generator, such as the one described in the '138 Patent, could be used as part of an "encryption/decryption module" to generate a device key seed.

Moreover, extrinsic evidence supports that an "encryption/decryption module" exists as stand-alone, structural software. For example, an "encryption/decryption module" often exists as an Application Programming Interface ("API") for operating systems. *See, e.g.*, Hurt Decl., Ex. G (ARMmbded API documentation containing symmetric and asymmetric encryption algorithms), Ex. H (Java javax.crypto API documentation containing pre-built symmetric key generators), Ex. I (Mac Developer Library Cryptographic Services Guide explain that "OS X and iOS provide a number of different APIs for encryption and decryption").   These are the type of

stand-alone "programs" that the patentee envisioned as off-the-shelf "encryption/decryption" modules.  In total, the evidence shows that the "encryption/decryption module" term is not a means-plus-function term but a known structure.  Consequently, the Court should decline to construe this term.

### 3.    Wherein the Device Key Seed $S_d$ is Said Randomly Generated (Claims 7 and 15)

| Claim Limitation | |
|---|---|
| "wherein the device key seed $S_d$ is said randomly generated in response to interrupts that notify the storage device of occurrence of the two specific operations" | |
| **Plaintiff's Construction** | **Defendants' Construction** |
| No construction is necessary.  Plain and ordinary meaning. | Claimed Function:<br>randomly generating a device key seed $S_d$ in response to interrupts that notify the storage device of occurrence of the two specific operations<br><br>Corresponding Structure:<br>Indefinite |

Similarly to the "encryption/decryption module" limitations, the Defendants allege that this "wherein" clause is a means plus function limitation and that it is indefinite for lack of corresponding structure.  The Defendants are incorrect.  For starters, Defendants improperly construe a method step as means-plus-function limitations.   Method claims are drawn to processes, and there is no requirement that a method claim disclose any structure.  *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 405 (S.D.N.Y. 1979); *Polycom, Inc. v. Codian Ltd.*, 2007 U.S. Dist. LEXIS 97892, *68 (E.D. Tex. Oct. 19, 2007); *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) (finding that the "method of claim 2 does not mention structure by which the 'venting' is to be performed. Thus, . . . the

district court improperly imported language from the specification into the claim."). Hence, the means-plus-function analysis should end here.

Essentially, the Defendants' objection with this claim limitation is a written description and enablement argument cloaked as a means-plus-function challenge. But claim construction is not the proper venue for such a determination because it raises numerous issues of fact. *Spectrum Pharms., Inc. v. Sandoz Inc.*, 2013 U.S. Dist. LEXIS 181673, *25 (D. Nev. Dec. 31, 2013). Instead, that issue is better left for summary judgment and trial. That is especially true when the examiner made written description and enablement rejections, the patentee traversed those rejections, and then the examiner allowed the claims in view of patentee's arguments. *See, e.g.*, Hurt Decl., Ex. F, at IV-INSEDTX-00000010.

But even if the term is a means-plus-function limitation, the Defendants' indefiniteness challenge still fails. The Defendants allege indefiniteness based on a supposed failure to disclose an algorithm corresponding to a function performed by computer software. But the algorithm requirement arises only when the corresponding structure of a means-plus-function limitation is a general-purpose computer. *Genband*, 2015 U.S. Dist. LEXIS 103512, *38–39; *Net MoneyIN Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008) ("[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function."); *see also WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."). Here, if any corresponding structure is actually required, that structure is the "encryption/decryption module"

as described above.  And that structure is not a "general purpose computer."  For the foregoing

reasons, the Court should reject the Defendants' indefiniteness challenge.

### 4. Wherein the Encryption/Decryption Module is Further Adapted to Randomly Generate the Device Key Seed (Claim 1)

| Claim Limitation | |
|---|---|
| "wherein the encryption/decryption module is further adapted to randomly generate the device key seed $S_d$ according to an occurrence time of one of the specific operations as obtained from a clock" | |
| **Plaintiff's Construction** | **Defendants' Construction** |
| No construction is necessary.  Plain and ordinary meaning. | Claimed Function: randomly generating a device key seed $S_d$ according to an occurrence time of one of the specific operations as obtained from a clock<br><br>Corresponding Structure: Indefinite |

This claim term gives rise to the same dispute as the "encryption/decryption module"

above.  The only difference is that this limitation adds a requirement that "the occurrence time of

one of the specific operations" is "obtained from a clock."  '555 Patent, claim 1.  Plaintiff

maintains that the "encryption/decryption module" is a structural limitation.  Thus, § 112, sixth

paragraph does not apply, and the Court should decline to construe the claim term.

Regardless, the '555 Patent teaches using time differences for operations, and it expressly

teaches using a clock to do so.  '555 Patent, col. 3 ll. 27–29 ("[A] device key seed $S_d$ is randomly

generated according to the time of a specific operation or the interval between two specific

operations on the storage device 120"); *Id*., col. 3 ll. 34–45 ("The interval can be measured using

the MCU (Micro Control Unit) tick number of the storage device 120"); *Id*., col. 3 ll. 52–56

("When each of the operations occurs, an interrupt is triggered to notify the MCU of the storage

device 120 regarding the requirement of the operation, and the storage device 120 can obtain the

system clock wherein the operation occurred.").  Because the "encryption/decryption module" is structural, and because '555 Patent teaches using clock inputs to generate a seed, the Court should not find this claim term indefinite.

## VI.    CONCLUSION

For the foregoing reasons, Intellectual Ventures respectfully requests that the Court reject the Defendants' proposed constructions, enter Intellectual Ventures' proposed constructions, and deny the Defendants' indefiniteness attempts.


DATED: October 28, 2015                    Respectfully submitted,

_____

CHRISTIAN  HURT


DEREK GILLILAND
STATE BAR NO. 24007239
EDWARD CHIN
STATE BAR NO. 50511688
KIRK VOSS
STATE BAR NO. 24075229
WINN CUTLER
STATE BAR NO. 24084364
CHRISTIAN J. HURT
STATE BAR NO. 24059987
ROSS LEONOUDAKIS
STATE BAR NO. 24087915
NIX PATTERSON & ROACH, L.L.P.
5215 N. O'Connor Blvd., Suite 1900
Irving, Texas 75039
972.831.1188 (telephone)
972.444.0716 (facsimile)
dgilliland@nixlawfirm.com
edchin@me.com
kirkvoss@me.com
winncutler@nixlawfirm.com

christianhurt@nixlawfirm.com
rossl@nixlawfirm.com

**BEN KING**
STATE BAR NO. 24048592
**NIX PATTERSON & ROACH, L.L.P.**
2900 St. Michael Drive, Suite 500
Texarkana, Texas 75503
903.223.3999 (telephone)
903.223.8520 (facsimile)
benking@nixlawfirm.com

**ATTORNEYS FOR PLAINTIFF
INTELLECTUAL VENTURES II LLC**

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served on all counsel who have consented to electronic service on this the 28th day of October, 2015.

_____
**CHRISTIAN HURT**
**NIX PATTERSON & ROACH, L.L.P.**